**IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

In re: JAIME CASTILLO TORRES, Debtor              No. 5:21-bk-71685
                                                                          Chapter 7

**ORDER AND OPINION OVERRULING OBJECTION TO EXEMPTIONS**

On December 5, 2021, Jaime Castillo Torres [debtor] filed his chapter 7 voluntary petition, and J. Brian Ferguson [trustee] was appointed as the chapter 7 trustee of the debtor's bankruptcy estate. The same day, the debtor filed his schedules and statements. In Schedule A/B, the debtor listed his 100% interest in certain real property located at 4346 North Oak Street, Springdale, Arkansas [Oak Property], and valued such property at $196,300. (Dkt. No. 1.) In the debtor's initial Schedule C, he claimed a homestead exemption in the Oak Property pursuant to the Arkansas Constitution, article 9, sections 3 and 5, in the amount of $97,127.[1] On February 6, 2022, the trustee filed his Objection to Claim of Exemptions [objection]. (Dkt. No. 16.) In his objection, the trustee argues that the debtor's homestead exemption is improper because the Oak Property is urban and, as a result, the debtor is entitled to claim an exemption of no more than one-quarter acre under article 9, section 5.

On February 17, 2022, the debtor filed two amended Schedule Cs. In his February 17 amendments, the debtor disclosed that the Oak Property consists of 1.1 acre and claimed an exemption in the Oak Property under article 9, section 4 of the Arkansas Constitution, rather than under section 5, as he had claimed in his original Schedule C.[2] Section 4 provides for a homestead exemption of up to eighty acres for rural property. After the debtor filed his first amended Schedule C on February 17, the debtor filed a response to

---

[1] This amount represents the debtor's equity interest in the Oak Property after deducting the amount owed on a mortgage listed on Schedule D from value of the Oak Property stated on Schedule A/B.

[2] The dollar amount of the claimed exemption remained the same as stated in the debtor's original Schedule C.

the trustee's objection, stating that one purpose of the amendment was to clarify the debtor's position that the property is rural.  Although the trustee did not file a formal objection to either of the debtor's two amended Schedule Cs, he has maintained his original objection that the debtor should be limited to a homestead exemption of one-quarter acre because, according to the trustee, the property is urban rather than rural.

On October 18, 2022, the Court held a hearing on the trustee's objection and the debtor's response.  J. Brian Ferguson appeared on behalf of the trustee.  Cindy Hawkins and Amy M. Driver appeared on behalf of the debtor.  At the conclusion of the hearing, the Court took the matter under advisement.  For the reasons stated below, the Court finds that the Oak Property is rural in nature and overrules the trustee's objection.

### I.    Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(B).  The following order constitutes finding of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding under Federal Rule of Bankruptcy Procedure 9014.

### II.    Applicable Law & Issue

Both the applicable law and the issue before the Court are straightforward.  A debtor may elect to claim exemptions pursuant to applicable state law.  11 U.S.C. § 522(b)(2)(A).  In this case, the applicable state law is Arkansas law.  Under Arkansas Code Annotated § 16-66-217, a debtor may claim a homestead exemption under the Constitution of the State of Arkansas, as the debtor did in this case.  The portion of the Arkansas Constitution under which the debtor claimed the Oak Property exempt provides that "[t]he homestead of any resident of this state who is married or the head of a family shall not be subject to the lien of any judgment, or decree of any court, or to sale under execution or other process thereon[.]"  ARK. CONST. art. IX, § 3.  Three elements are required to establish a homestead under the Arkansas Constitution: (1) the claimant must be married or the head of a family; (2) the property must be occupied as a home; and (3) the claimant must be a resident of Arkansas.  *Smith v. Webb* (*In re Webb*), 121 B.R. 827,

2

829 (Bankr. E.D. Ark. 1990). Here, the trustee concedes that the debtor meets these three requirements and is entitled to exempt some portion of the Oak Property as his homestead under Arkansas law. The parties disagree, however, regarding whether the property is rural or urban—a distinction that dictates how much of the Oak Property the debtor is entitled to exempt under the Arkansas Constitution. For rural property, article 9, section 4 provides:

> [t]he homestead outside any city, town or village, owned and occupied as a residence, shall consist of not exceeding one hundred and sixty acres of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of twenty-five hundred dollars, and in no event shall the homestead be reduced to less than eighty acres, without regard to value.

ARK. CONST. art. IX, § 4. For urban property, article 9, section 5 provides:

> [t]he homestead in any city, town or village, owned and occupied as a residence, shall consist of not exceeding one acre of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of two thousand five hundred dollars, and in no event shall such homestead be reduced to less than one-quarter of an acre of land, without regard to value.

ARK. CONST. art. IX, § 5.

Therefore, the only issue before the Court is whether the Oak Property is rural or urban. If the Court finds that the Oak Property is rural, the debtor may exempt up to eighty acres—or, more specifically, his entire 1.1-acre parcel. However, if the Court finds that the Oak Property is urban, the debtor may exempt only one-quarter of an acre of the property. ARK. CONST. art. IX, §§ 3-5.

"The determination of whether a property is rural or urban is based on the facts of each case." *In re Joe*, No. 6:13-bk-72529, 2015 WL 13776207, at *2 (Bankr. W.D. Ark. Mar. 9, 2015) (citing *In re Weaver*, 128 B.R. 224, 227 (Bankr. W.D. Ark. 1991) (citing *King v. Sweatt*, 115 F. Supp. 215, 220 (W.D. Ark. 1953)). Courts focus "on the characteristics of the property and surrounding area in determining whether the homestead should be considered rural or urban." *In re Evans*, 190 B.R. 1015, 1022 (Bankr. E.D. Ark. 1995). "If the community does not contain the common attributes and conveniences of a city,

3

then the property will be determined to be rural." *In re Weaver*, 128 B.R. at 227.  The debtor's use of the property is also "'very much pertinent' to the determination of the rural or urban character of a debtor's homestead." *Id.* (quoting *Farmers Coop. Assoc., Inc. v. Stevens*, 543 S.W.2d 920 (Ark. 1976)).  For instance, property used for "exclusively agricultural purposes" is generally deemed to be a rural homestead.  *Id.* However, property not used exclusively for agricultural purposes may still be determined to be rural.  *Id.* (citing *Bank of Sun Prairie v. Hovig*, 218 F. Supp. 769, 783-84 (W.D. Ark. 1963); *King v. Sweatt*, 115 F. Supp. at 218–19; and *George v. George*, 591 S.W.2d 655, 657 (Ark. Ct. App. 1979)).  Further, "whether a homestead is urban property is not 'altogether controlled by the corporate limits,' thus property located within the corporate limits of a town may still be determined rural and property outside the corporate limits may be determined urban." *In re Shefte*, 632 B.R. 772, 776 (Bankr. W.D. Ark. 2021) (quoting *In re Weaver*, 128 B.R. at 227).

It is well-settled under Arkansas law that "'homestead laws are remedial and should be liberally construed to effectuate the purpose for which they are intended.'" *In re Shefte,* 632 B.R. at 775-76 (quoting *In re Oldner*, 191 B.R. 146, 148 (Bankr. E.D. Ark. 1995)); *see also In re Joe*, 2015 WL 13776207, at *2 (quoting *Stuckey v. Horn*, 200 S.W. 1025, 1026 (Ark. 1918)); and *City Nat'l Bank v. Johnson*, 96 S.W.2d 482, 484 (Ark. 1936)). Additionally, "'[a]ll presumptions are to be made in favor of the preservation and retention of the homestead.'" *In re Shefte*, 632 B.R. at 775-76 (quoting *In re Kelley*, 455 B.R. 710, 715 (Bankr. E.D. Ark. 2011)).  Importantly, "[t]he court's ultimate decision 'must be determined based on the facts of each case and must be considered in light of the intent of the constitutional provisions allowing the exemption.'" *In re Shefte*, 632 B.R. at 776 (quoting *In re Oldner*, 191 B.R. at 149).  The burden of proving that the homestead exemption has not been properly claimed is on the objecting party.  Fed. R. Bankr. P. 4003(c).

### III.   Evidence

The debtor purchased the Oak Property in 2016.  At the time of the debtor's purchase, the Oak Property was located in the city of Bethel Heights, which had a population of

roughly 1300 residents.  (Obj. to Exemption Hr'g Tr. 76, Oct. 18, 2022.)  Bethel Heights operated two sewer systems, one of which was located directly adjacent to the Oak Property.  (Tr. 38.)  The Bethel Heights' sewer systems developed maintenance and bacterial issues that ultimately caused an environmental problem in the area.  (Tr. 39.)  In order to facilitate the remediation of these issues in Bethel Heights, the city of Springdale annexed Bethel Heights in September 2020, and closed down the two sewer systems within thirty days of the annexation.  (Tr. 24.)  It is undisputed that, since the annexation, the Oak Property has been located entirely within the city limits of Springdale, which has a population of between 87,000 and 88,000 residents.  (Tr. 34.)  It is equally undisputed that the Oak Property is zoned by the city of Springdale as being in an "A-1 Agricultural district."  (Debtor's Ex. 2.)

### A.  Trustee's Evidence

At the October 18 hearing, Heath Ward [Ward], Executive Director of Springdale Water Utilities, testified at great length about the prior hazardous conditions caused by the Bethel Heights' sewer facility to the south of the Oak Property and the measures that the city of Springdale took to contain the problem after the annexation.  He testified that Springdale placed above-ground sewer pipes in the area as a "stopgap measure."  (Tr. 79.)  Ward also testified that such above-ground pipes are the "most expeditious" remedy for this type of public health hazard and would have been used even in an area with skyscrapers.  (Tr. 69.)  According to Ward, while additional remediation measures such as burning down the old facility and burying the above-ground sewer pipes are planned for the site adjacent to the debtor's property, the environmental hazards no longer exist. (Tr. 24, 40, 42.)

Regarding the attributes of the area surrounding the Oak Property, Ward testified that there are cattle and chicken houses in the area.  (Tr. 51.)  He also testified that there is a well-maintained city park located to the south of the Oak Property, which he characterized as having an urban "feel" to it; there are two fire hydrants near the Oak Property; a busy road, Highway 264, is located to the north of the Oak Property; a portion of North Oak Street has been widened to accommodate increasing traffic; and the Oak Property has certain city utilities and services, such as water, fire protection, and trash

5

removal.  (Tr. 24-29.)  The Oak Property has never been on the city sewer system, but the property has a functioning septic system.  (Tr. 34, 189.)  Ward testified that the city does not recommend that residents with functioning septic systems switch to the city sewer system.  (Tr. 60.)  According to Ward, the city sewer system in the Oak Property area is currently of limited capacity.  (Tr. 53.)   In fact, Ward specifically advises residents with functioning septic systems that "until the day comes you need to replace it, I would just sock back a little money for the future, and hopefully we'll have a brand new sewer running through there in a few years that'll be both more efficient and affordable."  (Tr. 76-77.)  However, Ward also testified that it would be possible for the debtor to hook the Oak Property into the city sewer system—albeit at an expense to the debtor of $15,000 to $17,000.[3]  (Tr. 23, 37, 54.)

The trustee hired Nathan Genovese [Genovese], a Bentonville real estate agent, to assist him with answering the debtor's discovery requests and also called him as a lay witness at the October 18 hearing.[4]  Genovese testified that he visited the Oak Property area twice.  According to Genovese, the traffic on Oak Street was light on both occasions.  (Tr. 141.)  He testified that the nearest bank is 2.2 miles from the Oak Property and the nearest post office is 2.1 miles from the property.  (Tr. 109-10.)  Genovese also testified that the debtor's property is two miles from Interstate 49 and less than one mile from an intersection where there is a service station, a used car lot, "light industrial buildings," and "a heavy equipment dealer."  (Tr. 101.)  Genovese observed a church, a subdivision, an empty lot for sale, and an unspecified number of houses and businesses in the area.  (Tr. 102, 111.)  He also testified that there are two fire hydrants and two street lamps near

---

[3] According to Ward, the debtor could tap into the city sewer system from either the east or the west of his property, with either option costing the debtor approximately $15,000 to $17,000.  However, Ward testified that in the event the debtor tapped into the system from the west, he would likely incur the additional expense of being required to secure an easement.  (Tr. 54-55.)

[4] Under Federal Rule of Evidence 701, a lay witness may give testimony in the form of an opinion if it is "rationally based on the witness's perception . . . helpful to clearly understanding the witness's testimony or to determining a fact in issue; and . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

the Oak Property; commercial property to the west of the property; and a "hydro equipment rental service" in the area.  (Tr. 97-98.)  He testified that the former sewer treatment facility immediately adjacent to the Oak Property consists of one small building and nine acres of "open field."  (Tr. 111.)  He also testified that across the street from the Oak Property is "a single family residence on approximately an acre/acre and a half." (Tr. 112.)

### B.  Debtor's Evidence

At the conclusion of the trustee's case in chief, the debtor called rebuttal witness Mark E. Risk [Risk], a Fayetteville real estate broker and appraiser.  Like Genovese, Risk testified as a lay witness.  Risk testified that he visited the Oak Property three times and that the immediate area around the Oak Property had a rural "feel" to him.  (Tr. 151, 158.) Although Risk could not confirm whether there were "working farms" in the area, he testified that there is "plenty of cleared pastureland . . . on either side of Oak Street, you're going to find acreages of cleared land and acreages of woods."  (Tr. 155.)  He testified that septic tanks are most commonly used in rural areas.  (Tr. 159.)  He also testified that he observed no street lamps, gutters, or curbs in the area and that walking on Oak Street would be difficult because it has no shoulder.  (Tr. 154-55, 158.)  Regarding the property across the street from the debtor's, Risk testified that he saw two outbuildings and a camping trailer on that property, and the lot was bigger than he would expect to see in an urban area.[5]  (Tr. 155, 157.)  According to Risk, above-ground sewer lines are very rare, not usually in urban areas, and are "typically for outskirts, where they're going towards the sewer plant."[6]  (Tr. 160-61.)

---

[5]  Although Risk also testified about commercial, industrial, and residential buildings that he observed in the area surrounding the Oak Property, this portion of his testimony was largely duplicative of evidence already in the record and the Court need not recite it again.

[6]  At the hearing, the trustee objected to Risk testifying about power lines on the basis that such testimony exceeded the scope of rebuttal because the trustee's witnesses had not testified about that issue.  The Court reserved its ruling and now sustains the objection. "Rebuttal testimony should be directed to a rebuttal of the testimony" elicited by the opposing party.  *Stone v. Chicago, M., St. P. & P.R. Co.*, 53 F.2d 813, 816 (8th Cir. 1931).  Although courts have the discretion to "admit in rebuttal evidence which properly should have been introduced in chief," in this case, the Court declines to do so because

The debtor testified that he acquired his property for, and still uses his property for, agricultural purposes. He also testified that he bought the Oak Property because "[i]t felt like it had the style of a small farm and that's what I wanted. I felt like I could have animals there and I could have a little vegetable garden there. I felt like I could have chickens. It felt like a small farm to me." (Tr. 181.) In keeping with the debtor's stated reason for buying the property, he has a small pond on the property containing fish, he has had a chicken and a rooster on his property, and he maintains a vegetable garden in which he and his family work almost daily. (Tr. 183, 193.) In his garden, the debtor grows three to four different kinds of chiles, cucumbers, carrots, onions, three types of tomatoes, and cilantro. (Tr. 181, 191.) The debtor also grows cacti on the property, which he and his family cook in various ways and eat. (Tr. 182.) He testified that the garden provides a significant amount of food for his family and that "[i]t saves us a lot, from buying at stores, fruits and vegetables." (Tr. 183.) He preserves and freezes the foods grown in the garden for his family's use during the winter season. (Tr. 183.) In addition, the Oak Property has five or six varieties of fruit trees, including apple, pear, plum, apricot, and nut trees. The debtor testified that the food produced by those trees feeds his family for "most of the seasons until the cold comes, and then everything is over." (Tr. 182.) The debtor also cuts down trees on the Oak Property to use as firewood to heat his home during the winter months. (Tr. 183-84.)

The debtor further testified that, depending on traffic, it takes him fifteen to twenty minutes to get to the grocery store, twenty to thirty minutes for his daughter to drive to school, and approximately twenty to thirty minutes to reach a hospital.[7] (Tr. 188-89.)

---

the debtor did not disclose Risk as a potential witness in accordance with the parties' agreed scheduling order (Dkt. No. 73) and, as a result, Risk was permitted to testify at the October 18 hearing strictly for rebuttal purposes. (Tr. 144-49.)

[7] In the interrogatories propounded to the debtor by the trustee, the trustee asked the debtor in Interrogatory No. 1 to state how long it takes for him to drive from his home to certain locations. In response, the debtor gave estimates of seven minutes to drive to the nearest grocery store and nine minutes to drive to the nearest hospital. However, instead of giving time estimates based on his experience as he did during the October 18 hearing, his response to Interrogatory No. 1 was prefaced with the statement that the estimates were made "[u]sing approximate distances as shown in Google Maps." (Trustee's Ex. 8.)

According to the debtor, traffic is slow around his property, and it is a quiet area. (Tr. 185-86.) He testified that, while Highway 264 is busy, his house is far enough away that he does not hear the noise. (Tr. 185.) In addition, the debtor testified that "[a]t night, traffic does not bother me because there is no traffic. The street is very dark. And even though there is a housing addition, people don't like using that street because there's no lights." (Tr. 185.) There are also no sidewalks in front of the debtor's house. (Tr. 186.) The debtor testified that he has seen both cattle and hay bales on the land behind the park that is immediately adjacent to his own property. (Tr. 187, 195.) The debtor further testified that the property across the street from the Oak Property is similar to his own because it is "like a small ranch, a small farm." (Tr. 187.) The debtor's dog has killed armadillos, rabbits, and skunks on the Oak Property. (Tr. 184.) In addition, the debtor testified that he has heard frogs, coyotes, and many different birds, including owls, on the Oak Property. (Tr. 184.)

At the conclusion of the debtor's case in chief, the trustee called himself as a rebuttal witness. The trustee testified that he has seen armadillos, foxes, hawks, owls, raccoons, and skunks near his own urban residence. (Tr. 210.)

## IV.    Analysis

The facts in evidence show that the Oak Property has both rural and urban characteristics. Before discussing the specific facts that weigh in favor of each designation, the Court will first address the evidence that did not support either finding. Despite the significant amount of time at the hearing devoted to testimony about the environmental hazards caused by the former sewage facility located next to the Oak Property, there was no evidence that sewage-related hazards are inherently confined to only rural areas.[8] As a result, the Court finds that those prior hazards—which no longer exist, according to Ward—have no bearing on whether the Oak Property is urban or rural. Likewise, the

---

[8] The former sewage issue itself is a separate issue from whether a property is, or is able to be, connected to a septic system versus a city sewer system, which latter issue does bear on the determination of whether the property is rural or urban.

above-ground sewer pipes near the Oak Property area are not indicative of the property being urban or rural based on the evidence in this case. Ward testified—without contradiction—that the above-ground sewer pipes are the quickest way to remedy a public health hazard and would have been placed by the city of Springdale regardless of where the hazardous sewage problem had occurred.

In addition, the Court affords little weight to the fact that the debtor, who is currently on a septic system, could connect to the city's sewer system at a cost to him of $15,000 to $17,000. This hypothetical ability to connect to a city utility does not weigh in favor of a finding that the Oak Property is urban because the cost to do so would be impracticable for the debtor, who has monthly net income of $110.21 per month and no significant cash or savings. (See Dkt. No. 1.) Further, even if the cost of tapping into the city's sewer system were not prohibitive, the city would advise the debtor not to do it because the debtor has a functioning septic system and the city's system is of limited capacity. (Tr. 50, 53, 76-77, 189.)

Further, lay witnesses for both the debtor and trustee testified as to their personal opinions about how the area around the debtor's homestead "feels"—urban or rural. None of the witnesses were certified as experts and personal opinions by lay witnesses regarding how an area "feels" can be influenced by a multitude of factors unrelated to the objective character of the property, including where the witness was raised and the witness's relative life experiences in rural versus urban areas. Therefore, the Court finds such opinions too subjective to be reliable. Finally, the debtor testified to encountering a variety of birds and animals on the Oak Property. In rebuttal, the trustee called himself as a witness and testified that he has seen similar birds and animals near his own urban residence. However, absent expert testimony that certain wildlife is exclusive to only rural or only urban areas, the Court gave little weight to testimony on this subject.

The Court now turns to facts in this case that are pertinent to determining whether the Oak Property is urban or rural. As the Court stated above, there is evidence to support both designations. The facts weighing in favor of an urban designation include: the well-

10

maintained city park located to the south of the Oak Property; the Oak Property has a number of city utilities and services, such as water, fire protection, and trash removal; there are two fire hydrants near the Oak Property; both a bank and a post office are within approximately two miles of the debtor's property, a busy road, Highway 264, is located to the north of the Oak Property; and a portion of North Oak Street has been widened to accommodate increasing traffic.  Additionally, it is undisputed that the Oak Property is located wholly inside the city of Springdale, which is an important factor, though not determinative.  *See In re Shefte*, 632 B.R. at 776.

However, despite the presence of these urban characteristics, the Court finds that there is simply more evidence that the Oak Property is rural in nature.  The facts weighing in favor of a rural designation include: the absence of curbs, gutters, and sidewalks near the Oak Property; the Oak Property is adjacent to nine to ten acres of "open field" where cattle sometimes graze; there are chicken houses and hay bales on nearby properties; every witness testified that Oak Street has very little traffic; the debtor and many of his neighbors remain on septic systems; both the debtor's residence and the residence across the street from it sit on large lots of one acre or more; there are metal outbuildings and a trailer on the property across from the Oak Property; it takes between twenty and thirty minutes for the debtor to reach a hospital or for the debtor's daughter to reach her school; and, importantly, the Oak Property has been zoned by the city of Springdale as agricultural.

In addition, not only is the property zoned for agricultural use, but the debtor purchased the Oak Property with the intent to use it for agricultural purposes and has consistently done so.  The produce and nuts that the debtor grows, harvests, and preserves from the garden and fruit trees located on the Oak Property provide a source of food for the debtor and his family year-round, resulting in lower grocery expenses.  Although the city of Springdale annexed the smaller city of Bethel Heights four years after the debtor purchased the Oak Property, the debtor had no control over that event, and it had no effect upon the debtor's continued agricultural use of his property.  Under the facts of this case, and in the light of the policy that "all presumptions are to be made in favor of the

11

preservation and retention of the homestead," a debtor that acquired land for agricultural purposes in order to support himself and his family—even in part—and actually uses the land for that purpose, should not be denied his entitlement to a rural homestead simply because his neighbors, or even governmental entities, have taken steps toward urbanizing the surrounding area. *See In re Shefte*, 632 B.R. at 775-76.

## V.    Conclusion

For all of the above-stated reasons, the Court finds that the subject real property is rural in nature, and the Court overrules the trustee's objection to the debtor's exemptions.

IT IS SO ORDERED.

Honorable Bianca M. Rucker
United States Bankruptcy Judge
Dated: 12/06/2022

cc:    J. Brian Ferguson, Chapter 7 Trustee
       Cindy Hawkins, Attorney for the Debtor
       Amy M. Driver, Attorney for the Debtor
       United States Trustee

12